NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
BENJAMIN R. BARRON (Cal. Bar No. 247094)
RYAN H. WEINSTEIN (Cal. Bar No. 240205)
Assistant United States Attorney
OCDETF Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3542/8957
    Facsimile: (213) 894-0142
    E-mail:    ben.barron@usdoj.gov
              ryan.weinstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 15-511(A) |
|---|---|
| Plaintiff, | OPPOSITION TO DEFENDANT DALIBOR KABOV'S EX PARTE APPLICATION FOR LEAVE TO REQUEST RECONSIDERATION OF DENIAL OF POST TRIAL MOTIONS; EXHIBITS; DECLARATION OF BENJAMIN R. BARRON |
| v. | |
| BERRY KABOV, et al., | |
| Defendants. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Benjamin R. Barron, hereby files its Opposition to Defendant Dalibor Kabov's Ex Parte Application for Leave to Request Reconsideration of Denial of Post-Trial Motions.

///

///

///

This Opposition is based upon the attached memorandum of points and authorities, the attached exhibits, the attached declaration of Benjamin R. Barron, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: July 2, 2018

Respectfully submitted,

NICOLA T. HANNA
United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

 /s/
BENJAMIN R. BARRON
RYAN H. WEINSTEIN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

In January 2017, defendants Berry Kabov, Dalibor Kabov, and Global Compounding Pharmacy LLC were convicted following a three-week trial of orchestrating a massive narcotics diversion conspiracy, along with money laundering, drug importation, and tax evasion.

Seven months later, in August 2017, the defendants filed a 64-page Motion for New Trial (CR 238), which as the government addressed in its response was pervaded with false characterizations of the facts and evidence, and which failed to demonstrate grounds for the extraordinary remedy of a new trial (CR 243).  This Court denied the motion, concluding, among other things that "the evidence of Defendants' guilt was overwhelming" and that the Kabovs had failed to establish grounds for a new trial.  (CR 262 at 10.)

Defendant Dalibor Kabov now applies <u>ex parte</u> for leave to move for reconsideration of the order denying their prior motion for new trial (the "Application").  The Court should deny the Application. Literally all the "new" evidence cited in the Application were <u>provided in the pretrial discovery</u> in this matter, and thus are not "new" facts at all.  In any event, the Application – like the motion for new trial before it – cannot come close to demonstrating materiality in light of the overwhelming evidence.

**II.   SUMMARY OF FACTS**

The government will not set forth the evidence in extraordinary detail here, but offers the following summary to refresh the Court's recollection.  The government has already offered a detailed statement of facts along with supporting exhibits and record citations in its opposition to the prior new trial motion (CR 243).

Before they opened Global Compounding Pharmacy, the Kabovs were large-scale narcotic traffickers shipping thousands of opiate pills to an Ohio drug trafficking organization.  In January 2012, the United States Postal Inspection Service ("USPIS") interdicted two oxycodone parcels sent to a particular Columbus, Ohio drug trafficker, who ultimately became a cooperator (the "CS").  Later analysis showed each parcel bore Dalibor Kabov's fingerprints. During the same timeframe, the USPIS also interdicted other parcels each containing thousands of dollars in cash, which were going out from Columbus to commercial mailboxes located immediately near the Kabovs' residence and pharmacy (Global Compounding).  The parcels were each addressed either to Dalibor Kabov or to the Kabovs' associate Obai Ahmadi.  In March 2012, the USPIS conducted a trash search at the CS's residence and seized an empty parcel shipped from Los Angeles, which later analysis showed also had Dalibor Kabov's fingerprints on it.

In May 2012, the USPIS executed a search warrant at the CS's residence.  The CS confessed to buying thousands of pills of oxycodone at a time from the Kabovs, and later agreed to cooperate. On May 29, 2012, the USPIS agent gave the CS a phone and a recording device, and the CS began recording calls with Berry Kabov.  During the calls, Berry Kabov discussed setting up a new "clinic" and that he had a new supply (Global Compounding began operating the prior month), and Berry Kabov bragged about how oxycodone pills are "gold" and "go for fifty bucks a pill" in New York.  They discussed future deals of "20s" and "30s" (20- and 30-miligram strength oxycodone).

These conversations culminated in a controlled shipment of 1,000 pills of oxycodone to the CS on May 31, 2012; during the recordings,

Berry Kabov provided the tracking number for the drug parcel.  In June 2012, the CS and USPIS sent a parcel with $3,000 partial cash payment for the oxycodone; the parcel was addressed to one of the mailboxes that was the destination of the previously interdicted packages, 11301 West Olympic Boulevard #511 in Los Angeles.  In the recorded calls, the CS verified that it was sent to the "Olympic" mailbox, and the CS provided Berry Kabov with the tracking number.  In later calls, Berry Kabov confirmed receipt of the parcel and repeatedly demanded that the CS pay the remainder of his drug debt.

The recordings also include discussions between Berry Kabov and the CS about how the USPIS had interdicted the prior money and oxycodone parcels, which is why it was important to switch from using the United States Postal Service to private services such as FedEx.  (They used FedEx for the May/June 2012 controlled buy, and for the March 2012 empty parcel seized from the CS's trash.)

At trial, two witnesses familiar with Berry Kabov's voice identified it from the recordings.  Similarly, during one call, Berry Kabov stated that he was in Laguna Beach, and records verify that Berry Kabov in fact was staying at the Montage Hotel in Laguna Beach at that time.  The evidence also included multiple exemplar recordings of Berry Kabov's voice (seized from his cellphone in October 2015) to allow the jury to render its own comparison.  The jury also received evidence that Berry Kabov and the CS had a history of dealings, such as a record seized from the Kabovs' residence of a $14,800 cash parcel sent from the CS in Columbus to Berry Kabov in Los Angeles (each identified by name), which was interdicted by law enforcement one year before this investigation even opened.

When the USPIS ended the CS's active cooperation and went forward with prosecution against him under a cooperation plea agreement, the large drug debt owed by the CS to the Kabovs was left unpaid. As noted, the recordings show that Berry Kabov repeatedly demanded payment from the Ohio CS. Accordingly, as reflected in evidence seized from the Kabovs' cellphones and from their credit card records, in August 2012 the Kabovs drove cross-country in a failed attempt to track down the CS and demand payment. While in Columbus, the Kabovs exchanged text messages updating on their surveillances in Ohio and plotting their confrontation with the CS.

Throughout this time, and thereafter, the Kabovs used Global Compounding as a front to further their narcotics scheme, after the pharmacy began operating in April 2012. Wholesale records show that, using the pharmacy, the Kabovs immediately began ordering massive volumes of powerful narcotics, including in particular 20- and 30-mg oxycodone. To conceal their black market sales of the drugs, the Kabovs concocted an identity theft scheme wherein they paid kickbacks to a doctor, Joseph Altamirano, to generate hundreds of narcotic prescriptions in the names of identity theft victims. On searching the Kabovs' Brentwood residence, agents found a Google contact list dated two years before Global Compounding opened (later discovered to be a printout of Obai Ahmadi's contacts), which bore the names of the identity victims used by the Kabovs on the fraudulent prescriptions. Agents also seized text messages between the Kabovs and Altamirano arranging to meet late at night at bars, during which Altamirano would bring his "scripts" with him. (Altamirano is now cooperating and has confessed to taking cash kickbacks from the Kabovs for writing the fraudulent scripts.) The agents seized handwritten

4

ledgers documenting how the Kabovs kept track of which victim names to use on which prescriptions. The trial included testimony from four victims who verified that they had never been to Global Compounding, had never met or been examined by Altamirano, had never received or taken any of the drugs prescribed in their names, and that two of them did not even live in Los Angeles or California at the time scripts in their names were purportedly filled by them.

The evidence also showed how the Kabovs sought to conceal the scheme from state regulators. They would serially fail to submit mandatory reports to California's prescription drug monitoring program (CURES), resulting in underreporting of tens of thousands of pills, and what sales they reported identified the identity theft victims as the pharmacy's customers. The Kabovs exchanged text messages warning each other whenever a pharmacy board inspector arrived for an unannounced visit, and Dalibor Kabov assured his brother that he "bullsh[i]tted" one inspector who identified the pharmacy's failure to report to CURES.

The Kabovs also regularly lied in customer applications to wholesalers to induce them to agree to sell drugs to Global Compounding. Wholesalers cut off sales to the pharmacy on detecting red flags in its orders, and a manager at one wholesaler testified about how he identified the anomalies and cut off the pharmacy after less than three weeks. In late 2014, after five wholesalers had cut ties with the pharmacy, the Kabovs shifted the scheme. They ordered a pill press from China and enough narcotic powder to manufacture 100,000 pills. They then completely stopped reporting to CURES and stopped keeping any prescriptions, even though the Kabovs' own notes show they were pumping out thousands of narcotic pills at a time.

Financial evidence shows that, throughout this time (2011-2014), the Kabovs made more than $3 million in cash and received no insurance proceeds.  The Kabovs enjoyed a lavish lifestyle, including penthouse suits, expensive cars, and private jets.  Yet the Kabovs reported meager earnings in their federal tax returns for those years and also serially understated the pharmacy's earnings, accounting for a combined $1.5 million in unreported income.

Likewise, the evidence showed that even their separate steroids business was illicit: the Kabovs were ordering their drug stock from China, at the same time that they falsely advertised that their steroids came from Canada and Europe.  Yet the Kabovs' pharmacy license did not grant them any lawful authority to import controlled drugs at all, and accordingly they had no legal defense to charges against them for importing Schedule III steroids.

In 2015, the Kabovs also began to perpetrate yet another criminal scheme: they began submitting fraudulent claims for compounded creams to a labor union insurance program, also in the names of identity theft victims.  The owner of the medical clinic that provided the sham prescriptions to the Kabovs is also cooperating and has confessed her role in the scheme.  The Kabovs paid her more than $350,000 in kickbacks to secure her participation in the scheme.  In total, between January 2015 and their arrest in October 2015, the Kabovs received $2.6 million in paid claims form the labor union insurance plan for the fraudulent billings.

**III. ARGUMENT**

The Court should deny defendant Dalibor Kabov's Application. Under Local Rule 7-18, "A motion for reconsideration of the decision on any motion may be made only on the grounds of . . . (a) a material

6

1  difference in fact or law from that presented to the Court before
2  such decision that in the exercise of reasonable diligence could not
3  have been known to the party moving for reconsideration at the time
4  of such decision, or (b) the emergence of new material facts or a
5  change of law occurring after the time of such decision, or (c) a
6  manifest showing of a failure to consider material facts presented to
7  the Court before such decision."

8  The Application fails to satisfy that standard.  Literally all of the facts cited in the Application (to the extent they are even accurate) were <u>produced to the Kabovs and known to them prior to trial</u>, and in any event are facially immaterial.

### 1. Commercial Mailboxes

In paragraphs (B)(1)-(3) of the <u>Ex Parte</u> Application, D. Kabov claims that the government suppressed evidence that the three commercial mailboxes used to ship money from Ohio to Los Angeles were held by third parties: (1) 2355 Westwood Blvd. #409, Los Angeles, CA 90064; (2) 11901 Santa Monica Blvd. #369, Los Angeles, CA 90025; and (3) 11301 West Olympic Blvd. #511, Los Angeles, CA 90064.

The government in fact produced records for each of those mailboxes prior to trial.  Exhibit A are subpoenaed records regarding the #409 and #511 mailboxes, along with a DEA investigative report summarizing their contents.  Exhibit B is a record <u>seized from the Kabovs' residence</u>, which showed that the #369 mailbox <u>was opened by Dalibor Kabov in his name</u>.

Accordingly, Dalibor Kabov has failed to show any "new" facts at all.  Nor has he shown facts that "in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of" the prior new trial motion.  Local

7

Rule 7-18. Aside from the foregoing productions, the Kabovs obviously knew whether they ever opened any of the above mailboxes, and they retained diligent counsel who could have readily obtained mailbox records if the defense believed they would be helpful.

In any event, Dalibor Kabov also fails to establish materiality in light of the overwhelming evidence, as summarized above. As the Court knows, and consistent with common sense, criminals routinely use third party nominees to conceal drug trafficking, here the use of nominee mailboxes (and also, relevant to the next section, "burner" phones). The Application particularly fails to show materiality given that Dalibor Kabov possessed a record showing that mailbox #369 had been opened in his name, and given that even mailbox #511 was held in the name of the Kabovs' associate Obai Ahmadi and was the subject of explicit discussion during the May-June 2012 recorded calls and related controlled transaction. In any event, the seized money parcels were only one part of a far broader case; the evidence overwhelmingly shows the Kabovs' involvement in the narcotics trafficking scheme, and even the recorded calls include references to the earlier interdicted parcels.[1]

        2.   <u>Phone Used to Speak with Ohio CS</u>

In paragraph (B)(4), Dalibor Kabov also claims the government suppressed evidence that the phone used by Berry Kabov to speak with the Ohio CS, (310) 593-1027, was held in a third party name. Here again, the government produced subscriber records showing that the

---

[1] Dalibor Kabov claims that he held a different mailbox at the 11901 Santa Monica Boulevard facility, namely, #487 rather than #369. Obviously, even accepting this as true, that Dalibor Kabov controlled a mailbox at the same location to which Ohio money parcels were sent <u>corroborates</u> the government's case, and thus that fact would not be material, let alone even exculpatory.

8

phone was subscribed in a third party's name.  See Exhibit C. Accordingly, there is no "new" evidence at all, let alone new evidence satisfying the exacting standard under Local Rule 7-18.

Nor is such "new" evidence material, for all the reasons set forth above.  The evidence overwhelmingly established that Berry Kabov used the "burner" phone to speak with the CS, including voice identification, records verifying that Berry Kabov was in the same place as the speaker on the calls, the admission of independent exemplars of his voice.  The evidence also overwhelmingly proved Berry Kabov's involvement in the broader trafficking conspiracy.

### 3. Fingerprint Evidence

In paragraphs (B)(5)-(6), Dalibor Kabov asserts that the government concealed evidence related to its fingerprint analyst, Angela Pratt, who identified Dalibor Kabov's fingerprints on two drug parcels interdicted in January 2012 and on an empty parcel seized from the Ohio CS's trash in March 2012.  Defendants claim that the government withheld Ms. Pratt's "first fingerprint comparison of the defendants['] prints in January of 2014" (Motion at 7-8), yet this claim is factually incorrect.  The government produced to the defense the analyst's notes, to include her January 2014 analysis, attached here as Exhibit D.  In any event, the claim is factually incorrect for another, more obvious reason: defendant Dalibor Kabov was not arrested until October 2015, and thus the fingerprint exemplar used by the analyst to make the positive match that was the subject of her trial testimony was not available in January 2014.

Dalibor Kabov also claims that, in preparing his Application, he has retained a new fingerprint expert who was able to "exclude" any possibility that his (Dalibor. Kabov's) fingerprints were on a "get

9

well" card inside the May 2012 oxycodone parcel, namely, the controlled delivery conducted after the Ohio CS began cooperating. (Application at 8.)[2] Yet the government <u>never claimed</u> that Dalibor Kabov's fingerprints were found on that parcel; his prints were found on three other parcels, namely, the two oxycodone parcels seized in January 2012, and the empty parcel seized from the CS's trash in March 2012. As the government's analyst testified, all but one of the latent prints lifted from the May 2012 parcel did <u>not</u> match Dalibor Kabov, and the only reason she could not rule out the final latent was because one of the fingerprints on Dalibor Kabov's post-arrest card was not sufficiently clear to render a conclusion.

More importantly, this was known to Dalibor Kabov before trial. <u>Defendant retained his own fingerprint expert prior to trial to independently review the government analyst's results</u>, and at Mr. Nurik's request the government produced high-resolution images of the latent prints lifted from the parcels along with a high-resolution copy of Dalibor Kabov's post-arrest print card, as shown in Exhibit E. (Tellingly, the defendants never called their expert to testify, reflecting that the expert would have confirmed the government analyst's conclusions.) Moreover, Mr. Nurik told the government that his expert conducted an examination of the final latent found on the "get well" package from the May 2012 controlled buy, which the expert compared to a new set of Dalibor Kabov's exemplars that the defense created, based on which the defense expert concluded that there was no match to D. Kabov at all, as shown in Exhibit F. Rather than call

---

[2] The government is not sure how defendant is funding this expert, given that defendants have CJA counsel and have represented to the Court that they are indigent, despite the $5.6 million that they made from their criminal scheme.

the defense expert to testify, Mr. Nurik cross-examined Ms. Pratt on that point.  Accordingly, here again, defense fails to point to newly discovered – let alone material – facts.

The final "new" fact cited by defendant is not a fact at all: defendant's investigator states that "I believe . . . Dalibor Kabov's prints were available since 2007" because of his immigration status. Of course, this is speculation, not evidence.  In any event, it is entirely immaterial.  Ms. Pratt testified about the positive match to Dalibor Kabov's post-arrest fingerprint exemplar, and prior to trial the defense retained its own expert who conducted an independent examination both of the post-arrest fingerprint exemplar and also of a new exemplar that the defense created on its own prior to trial, yet the defense never called that witness to testify that Ms. Pratt was wrong in any of her conclusions.  In any event, defense counsel cannot show materiality, here again, in light of the overwhelming evidence against him as summarized above.

**IV. CONCLUSION**

For the foregoing reasons, the Court should deny the Application.  It has been more than 18 months since the defendants were convicted at trial on all counts against them.  Defendants have already had an opportunity to litigate an extremely lengthy (and erroneous) motion for new trial.  It is time to bring this case to a much-needed conclusion.

**DECLARATION OF BENJAMIN R. BARRON**

1. I am an Assistant United States Attorney and counsel for the government in this matter. I have knowledge of the facts set forth herein and could and would testify to those facts fully and truthfully if called and sworn as a witness.

2. Attached hereto as Exhibits A, B, C, and D are true and correct (albeit redacted) copies of materials produced to defendants in pretrial discovery.

3. Attached hereto as Exhibits E and F are true and correct (albeit highlighted) copies of email correspondence with defense counsel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on July 2, 2018.

/s/
BENJAMIN R. BARRON
Assistant United States Attorney